LAKE, The (VANTINE v.). See Case No. 16,878.

LAKEMAN (UNITED STATES v.). See Case No. 15,552.

## Case No. 7,995.

LAKE ERIE & B. STEAMBOAT CO. v. The SON & HEIR.

[5 West. Law Month. 98.]

District Court, N. D. Ohio. June, 1863.

COLLISION — INTEREST IN VESSEL SUFFICIENT TO MAINTAIN LIBEL—STEAMER AND SAIL VESSEL —AVOIDANCE OF ACCIDENT.

[1. One who holds a vessel under a charter party has such a special property therein that he may maintain a libel against another vessel for damages on account of collision.]

[2. A collision occurred upon Lake Erie in the daytime, with fair wind and water, between a steamer coming into the port of Cleveland and a schooner. The steamer rounded and stood in for her pier in the outer harbor. At this time the schooner was some way ahead, and apparently bound for the inner harbor. Very soon after the steamer rounded, the schooner suddenly came around, and made across the steamer's bow. She was warned off. It was then too late for the steamer to avoid the collision by stopping or backing. It might have been avoided had the schooner, after coming around, luffed or cast anchor. Held, that the collision was entirely the fault of the schooner.]

In admiralty.

Willey & Carey, for libellant.

Mr. Prentiss, for claimant.

WILLSON, District Judge. It is claimed by the proctors for the libellants in this case, that on the morning of the collision (30th June, 1860) the steamboat Western Metropolis, on her regular trip from Buffalo to Cleveland, rounded to at her usual place in the lake, and stood in for her pier in the outer harbor.

That, when the starboard order was given on the steamer, there was no vessel in view with which she was likely to interfere; the schooner Son & Heir being some way ahead of her, and apparently bound for the inner harbor. That after the Metropolis had rounded to, and got on course to the pier, the schooner was discovered to have come around, and to have suddenly shaped her course across the line of progress of the steamer. That it was then too late for the steamer, either by stopping and backing, or by porting, to avoid the schooner, unless the latter should let go her anchor, or luff into the wind. That the only resort left to the Metropolis was to keep on her course with a greater speed than usual in coming to her dock, leaving the schooner to pass her stern. That the schooner, instead of coming up into the wind, or keeping her course and going astern of the steamer, or of casting anchor, bore away several points towards the shore, and then came up again; thus bringing herself further forward on the steamer's line of progress, and striking her seventy or eighty feet from the stern.

The specific faults imputed to the schooner, as set forth in the libel, are (1) for suddenly coming round across the course of the steamer; (2) for not keeping her course, instead of paying off, which, it is alleged, would have carried her well under the steamer's stern; and (3) in not coming up into the wind, or dropping her anchor, when the master of the schooner saw he had made it impossible for the steamer to avoid the vessel.

The theory of the defence is, that the steamer rounded to at an unusual place in the lake, it being further east, and consequently that her course to her dock was not the customary course of the Buffalo & Cleveland line of steamers; that had the steamer rounded to,

and come up to her dock in the usual way, she would have passed under the stern of the schooner without injury to either vessel. It is averred in the answer that the schooner came around about three-fourths of a mile out in the lake, and abreast of the Government pier, and stood on her course for the Pittsburgh pier, where she was destined for a load of coal. And the answer denies any change of course of the schooner, or that she was in fault in any of her movements, or in any omissions of duty, or that she could have put her helm down in season to avoid the collision when it had become apparent that it was not in the power of the steamer to escape by stopping and backing

There was a preliminary question raised in the argument, as to whether the libellants had any right to sue for the injury done to the steamer by the collision, as the steamer was merely held and used by them under a charter party. We think there is no force in the objection. The libellants had a special property in the steamer under their contract with the real owners, and they also had the possession and were at the time in use of the property. The damage accrued against the use, and the possession of the property gives the right to sue for its injury. The libellants, undoubtedly, have a proper standing in court.

This collision occurred in the daytime, on smooth water, and where there was ample room and wind to safely control the movements of both vessels. There must have been gross and culpable negligence somewhere which produced the collision; and the question is, on which vessel does the fault lie?

The testimony is conflicting as to the exact place in the lake where the schooner came round and shaped her course for the coal pier. The direction of the wind, which was N. N. E., and the course of the schooner, which was E. and by N., and the certain place where the vessels came in contact, together with the testimony of Quinlan, Johnson, and Goldsmith, make it clear the schooner came round off and near the end of the Centre freight pier. That she soon afterwards changed her course by bearing away to the southward, is a fact established, if we are to credit the testimony of Dunlap, Quinlan, and Nutt, who were most favorably located for making close and accurate observation. In these movements, the schooner was obviously in fault. They were calculated to mislead the officer in charge of the steamer as to her intended course and destination. Besides, it was the plain duty of the schooner, after coming in such close proximity to the steamer and her line of progress, to have cast anchor, or luffed into the wind, by which her headway could have been stopped in a distance of once her length, and the collision avoided. But her wheel was not put down until her jib-boom was within 12 feet of the steamer's wheel-house, when the disaster became inevitable. From a careful examination of all the testimony in the case, we are of the opinion that the steamer was not in fault in any particular. Capt. Goldsmith swears, positively, that the steamer was turned in the lake for her pier at the usual place, and that she came in on the usual course. The testimony of H. J. Webb is to the same import. The angle at which the steamer came to her dock, and the facility with which she came alongside of it and landed her passengers, confirm the testimony of these witnesses in regard to the steamer's turning in the lake and her course to the pier. The management of the steamer, after turning in the lake, and while coming to the pier, seems to us entirely unexceptionable. Capt. Goldsmith was on the pilot-house by the bells, giving the strictest attention to his duties. Just after the turning he rang the checking-bell, and the steamer blew her whistle the second time and her speed was greatly reduced. He attentively watched the devious movements of the schooner, and hailed her three times to go about; and seeing that his requests were disregarded, and that by attempting to stop or port the helm of the steamer the dangers of disaster would be augmented, he increased the steamer's speed in the hope of evading a collision. In all this we think he displayed good judgment and excellent seamanship, and had the master of the schooner been actuated by common prudence, and have luffed into the wind, he would have done what good seamanship palpably demanded, and thereby avoided the disaster. The schooner was clearly in fault, and must be condemned to pay the full damages sustained by the steamer and costs of suit.